## OCEAN MARINE INS. CO. v. LINDO.

Circuit Court of Appeals, Ninth Circuit.
February 18, 1929.

Rehearing Denied March 28, 1929.

No. 5625.

Bell & Simmons, W. S. Andrews, and Golden W. Bell, all of San Francisco, Cal., for appellant.

S. Hasket Derby, of San Francisco, Cal., Carroll Single, of New York City, and Joseph C. Sharp and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal., for appellee.

Before RUDKIN and DIETRICH, Circuit Judges, and BEAN, District Judge.

BEAN, District Judge. This is an appeal from a decree in favor of the appellee in an action on an insurance contract, loss, if any, payable to the appellee's assignor, Schlubach, Sapper & Co., or order.

In March, 1924, Schlubach, Sapper & Co., who were engaged in business in Guatemala City, Guatemala, purchased of Palazio & Co., at Corinto, Nicaragua, a quantity of cotton for the purpose of filling an order previously received by them from Ibanguen Hermanos, owners of a mill in the interior of Guatemala. The cotton was to be carried by steamer from Corinto to San Jose, the port of entry for Guatemala, and after passing the customs to be there delivered to Schlubach, Sapper & Co. to cars, for final shipment by rail to Ibanguen Hermanos. On March 25th, 45 bales of cotton thus purchased were shipped from Corinto by steamer Eupatoria, and on April 4th, 96 bales by steamer San Jose, all of which were consigned to Schlubach, Sapper & Co. at San Jose. Prior to these shipments, the appellant had issued to Palazio & Co. an open marine policy of insurance covering loss and damage by fire to goods shipped by them from Corinto to various ports, including Guatemala, and Palazio & Co. had authority to issue certificates under such policy covering shipments made on their own account as principal, or as agents for others, or for account of others when ordered to insure. This policy was in force at the time of the shipments, and at the request of Schulbach, Sapper & Co., Palazio issued certificates thereunder covering the shipments in question, loss if any payable to them.

The Eupatoria arrived at San Jose on April 4th, discharged her mail and passengers, but, being unable to discharge cargo on account of the congested condition of the port, proceeded to Champerico, a distance of about 70 miles, returning to San Jose on April 11th, when the 45 bales of cotton were discharged and placed in the custom house bodega (warehouse). The San Juan arrived at San Jose on April 10th, and the 95 bales were discharged and placed in the custom house bodega. On the 16th of April and before the customs regulations had been complied with and the cotton removed by the consignee for reshipment to its ultimate destination, the custom house buildings were burned, and 129 bales of cotton destroyed by fire. Due proof of loss was made and payment refused; hence this suit.

It is claimed by the appellee that Schlubach, Sapper & Co. had no insurable interest in the cotton at the time of the fire, because they had parted with the title to Ibanguen Hermanos. After the cotton had been delivered in the custom house and before the fire, Schlubach, Sapper & Co. assigned the bills of lading covering the shipments to Ibanguen Hermanos and received payment for them, but there had been no delivery of the goods, and Schlubach, Sapper & Co. were still obliged under their contract to deliver at railroad station at San Jose, and for that purpose the bills of lading were returned to them.

Under such circumstances, the title still remained in Schlubach, Sapper & Co., and the loss fell upon them, and they returned to Ibanguen Hermanos the money paid by them.

Nor is there any merit in the contention that the insurance on the 45 bales of cotton shipped on the Eupatoria ran out because the vessel did not discharge the cotton upon her first call at San Jose, or until her return from Champerico. This was not the beginning of a new voyage beyond the point of destination, but a mere unimportant change or continuation of the original voyage permitted, we take it, by the insurance contract, and not unusual along the coast of Central America.

Finally, it is the position of the appellant that the insurance risk terminated when the cotton was deposited in the custom house

at San Jose. This requires a construction and application to the facts of a clause of the policy which reads: "The insured goods are covered, subject to the terms of this policy, from the time of leaving the shippers' or manufacturers' warehouse during the ordinary course of transit until on board the vessel, during transshipment if any, and from the vessel whilst on quays, wharves, or in sheds during the ordinary course of transit until safely deposited in the consignee's or other warehouse at the destination named in the policy; but in any event risk hereunder to cease within ten days after landing at destination." This clause in marine insurance policies seems to be of comparative recent origin, and there is apparently but little authority as to its application under circumstances similar to those in the instant case. The only cases to which our attention has been called at all analogous are those of Martin v. Nippon Seas, 3 Commercial Cases 164, and Ganiere v. Eastern Co., 7 Lloyd List Law Reports, 188. In the Martin Case, the policy covered the goods until safely delivered to the consignee. The goods were entered at the custom house, after which they were held by the customs authorities in the name of the consignees and to their order, subject to the payment of duties, storage, and other charges. The goods while in the custom house were totally destroyed by fire. The court found as a fact that for the purpose of the custody of the goods the warehouse of the customs was the warehouse of the consignee, and therefore delivery to such warehouse was a delivery to the consignee. In the Ganiere Case, the goods covered by a policy containing a "from warehouse to warehouse" clause were received at the Petrograd custom house and ultimately taken by persons purporting to act on behalf of the Russian government, and the court held as a fact that the custom house was not holding as the agent of the consignee, and consequently the insurance had not terminated or run out. It would seem therefore that whether goods covered by a marine policy containing a "from warehouse to warehouse" clause have, in a given case, been safely deposited in the consignee's or other warehouse at destination, is a question of fact from the circumstances of each particular case.

Now the evidence shows that all goods going to Guatemala, whether dutiable or not, must pass through the custom house at San Jose, comply with the customs regulations, and pay certain fees. Until these requirements are complied with, the consignee is not entitled to the possession of the goods. There

was no unreasonable delay on the part of the consignee in the instant case. As a consequence it cannot be said, we think, that the goods were safely deposited in the consignee's or other warehouse within the meaning of the policy, while in the custom house, regardless of the nature or character of the building or structure used by the government for the storage of goods while passing customs. The warehouse to warehouse clause was evidently intended to cover the goods after being discharged at port of destination while in the ordinary course of transit to the consignee's warehouse, or some other equivalent place of storage where the goods were held for the consignee. The risk continued after the goods were landed and during the period reasonably required for this purpose, not exceeding 10 days.

We are unable therefore to agree that taking the goods to the custom house for the purpose of clearance accomplished the safe deposit thereof in consignee's or other warehouse referred to in the policy, in the absence of some voluntary act of neglect of the consignees indicating an intention to adopt the custom house as a place of storage of their goods.

Decree affirmed.