**LUMBER & WOOD PRODUCTS, INC.,**
**Plaintiff-Appellee,**

**v.**

**NEW HAMPSHIRE INSURANCE COM-**
**PANY, etc., Defendant-Appellant.**

No. 86–5025.

United States Court of Appeals,
Eleventh Circuit.

Jan. 14, 1987.

Smathers & Thompson, Henry Bolz, III, Miami, Fla., for defendant-appellant.

Jack M. Coe, Lee, Schultz, Murphy & Coe, Thomas J. Schulte, Coral Gables, Fla., for plaintiff-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

GARZA, Senior Circuit Judge:

On September 13, 1979, Hurricane Frederic struck Chickasaw, Alabama and caused substantial damage to certain lumber stored on a shipping dock. Plaintiff-Appellee, Lumber & Wood Products, Incorporated ("Lumber & Wood"), filed a claim against Defendant-Appellant, New Hampshire Insurance Company ("New Hampshire"), seeking recovery for the loss. New Hampshire denied the claim. Consequently, Lumber & Wood filed a complaint against New Hampshire to have coverage determined and damages assessed. The district court judge entered a final judgment in favor of Lumber & Wood on December 11, 1985, reasoning that the cargo was still "in transit" because its placement on the consignee's dock was not intended as a final resting place for the cargo. We must reverse the district court's judgment because the policy's coverage expired prior to Hurricane Frederic's rampage in Chickasaw.

Lumber & Wood is in the business of purchasing lumber from various sources in South America and selling the lumber to various purchasers in the United States and elsewhere. Delta Hardwood Corporation ("Delta Hardwood") is in the business of purchasing shipments of lumber from Lumber & Wood and, thereafter, reselling the lumber in smaller lots to buyers in the Mobile, Alabama area. In June of 1974, New Hampshire issued a master Marine Open Cargo Policy to Lumber & Wood to insure shipments of lumber while being transported from South America to the United States. Certificate of Insurance No. 44, dated June 15, 1979, was issued to cover a shipment of bundled lumber aboard the M/V "Gina Star" from Brazil to Delta Hardwood's dock in Chickasaw.

The subject cargo was loaded aboard the M/V "Gina Star" and transported to Chickasaw without incident. The lumber, in good order and condition, was off-loaded and completely discharged onto Delta Hardwood's private dock on August 11, 1979. Delta Hardwood, the consignee, was the private owner of the contiguous berth, dock space and warehouse facilities at Chicasaw. The lumber had to be moved approximately ninety feet to be placed in Delta Hardwood's warehouse. Moreover, Del-

---

* Honorable Reynaldo G. Garza, Senior U.S. Senior Circuit Judge for the Fifth Circuit, sitting by designation.

ta Hardwood had overall responsibility concerning the grading, inspecting and movement of the lumber once off-loaded from the vessel. Delta Hardwood, in the past, had sold some lumber directly from the dock to purchasers. On August 12, upon receiving notice that the lumber had arrived at Chickasaw, Lumber & Wood issued an invoice to Delta Hardwood for the entire shipment and created an account receivable for the invoiced amount.

There was a conflict in the testimony given regarding several phone conversations that took place just before Hurricane Frederic struck. Apparently, a Delta Hardwood agent contacted a Lumber & Wood agent about a delay in storing the subject lumber in the warehouse due to a previous shipment which occupied a portion of the warehouse. The agent for Lumber & Wood testified that she was assured by New Hampshire that the insurance was in full force and effect as long as the lumber in question was out of the insured's control.

On September 13, 1979, Hurricane Frederic caused $63,025.23 worth of damage to the lumber which had remained on the dock. Approximately 10% of the subject lumber was still on the dock at the time of the destruction. Thirty-two days had elapsed from the delivery of the lumber at Delta Hardwood's facilities on August 11, until the arrival of Hurricane Frederic on September 13. After the commencement of legal action, Delta Hardwood and Lumber & Wood executed an assignment of Delta Hardwood's claim back over to Lumber & Wood.

The district court judge ruled that coverage existed because the cargo was "in transit" as it sat on Delta Hardwood's dock. The court reasoned that the premiums charged by New Hampshire did not contemplate the dock as a final resting place, but rather a warehouse to warehouse arrangement was intended and such should be strictly enforced pursuant to the agreement. Final judgment was entered in favor of Lumber & Wood in the principal sum of $63,025.63. The court also ordered New Hampshire to pay pre-judgment interest on the damages at a rate of 10% per annum from October 10, 1979, until the date of judgment, totalling an additional $38,-886.12. Further, New Hampshire was ordered to pay Lumber & Wood its reasonable attorneys' fees in the amount of $25,-000, for a total of $126,911.75, upon which interest would accrue at a rate of 7.87%, pursuant to 28 U.S.C. § 1961.

■ It is the district court's statement in its fifth Conclusion of Law, "the goods were in transit until they had been inspected and accepted in the buyer's warehouse," that forms the basis for this appeal. As such the clearly erroneous standard is inapplicable, but rather a *de novo* review is appropriate because a construction of this policy of insurance involves a mixed question of law and fact, and therefore we are free to substitute our judgment for that of the district court. *See Chevron U.S.A., Inc. v. Belco Petroleum Corp.*, 755 F.2d 1151, 1153–54 (5th Cir.) ("The facial interpretation of the contract is a question of law not subject to the clearly erroneous standard"), *cert. denied*, —— U.S. ——, 106 S.Ct. 140, 88 L.Ed.2d 116 (1985); *Washington v. Watkins*, 655 F.2d 1346, 1352–53 (5th Cir.1981) ("Mixed questions of fact and law are not, as a general matter, reviewable under the clearly erroneous standard"), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). The fundamental issue in this case focuses on the construction of the Warehouse to Warehouse and Marine Extension Clauses [1] of the Marine

1. Clause 25, the Warehouse to Warehouse Clause, provides:

This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration and/or Certificate for the commencement of the transit and continues during the ordinary course of transit, including customary transhipment, if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter, the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the Policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the

Open Cargo Policy as to whether the lumber was "in transit" within the meaning of those clauses.

■ On August 11, all lumber was safely discharged from the M/V "Gina Star" and delivered to Delta Hardwood. On August 12, Lumber & Wood invoiced Delta Hardwood for all the lumber. The assignment of title back to Lumber & Wood after the legal action was commenced clearly establishes that Delta Hardwood not only had possession on the date of loss, September 13, but also had ownership.

Coverage ceases, according to the policy, upon the occurrence of either a delivery to the final warehouse, August 11, or the expiration of fifteen days after discharge, August 26. Clearly, the lumber, having sat idly on Delta Hardwood's dock for thirty-two days after delivery, was not "in transit" within the intent and meaning of the Marine Open Cargo Policy when it was damaged by Hurricane Frederic on September 13. The trial court made a Finding of Fact that the contract of insurance was entered into in the State of Florida. Under Florida law, if the terms of an insurance policy are clear and unambiguous, they are to be taken and understood in the plain,

ordinary and popular sense. *Peninsular Life Ins. Co. v. Rosin,* 104 So.2d 792, 795 (Fla.Dist.Ct.App.1958). According to the clauses in the policy, once this cargo was delivered to the consignee and once it exercised dominion and control over the cargo, treating it as its stock in trade, the final warehouse had been reached.

As the Ninth Circuit declared in an early case dealing with a warehouse to warehouse clause: "The warehouse to warehouse clause was evidently intended to cover the goods after being discharged at port of destination while in the ordinary course of transit to the consignee's warehouse, or some other equivalent place of storage where the goods are held for the consignee." *Ocean Marine Ins. Co. v. Lindo,* 30 F.2d 782, 784 (9th Cir.1929). More recently, in *Budco Associates, Inc. v. Royal Exchange Assurance of America,* 53 A.D.2d 568, 384 N.Y.S.2d 819 (1976), the question of whether post-delivery fire loss was covered by the transit policy turned on whether the consignee had "exercised dominion over the goods so that it might be said that delivery had occurred." 384 N.Y.S.2d at 820.

Delta Hardwood, as a past practice, sold lumber directly from its dock. It had the

limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight on the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be arranged in the event of transhipment, if any, other than as above or in the event that delay in excess of the above time limits arising from circumstances beyond the control of the ASSURED. It is necessary for the ASSURED to give prompt notice to these ASSURERS when they become aware of an event for which they are "held covered" under this Policy and the right to such cover is dependent on compliance with this obligation.
Clause 26, the Marine Extension Clause, provides:
I. This insurance attaches from the time the goods leave the warehouse at the place named in the Policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the final warehouse at the destination named in the Policy, certificate or declaration, or a substituted destination as provided in Clause III hereunder.

II. This insurance specially to cover the goods during
(i) deviation, delay, forced discharge, reshipment and transhipment,
(ii) any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment.
III. In the event of the exercise of any liberty granted to the shipowner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than the original insured destination, the insurance continues until the goods are sold and delivered at such port or place; or, if the goods be not sold but are forwarded to the original insured destination or to any other destination this insurance continues until the goods have arrived at final warehouse as provided in Clause I.

\* \* \* \* \* \*

VII. It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond the control of the ASSURED.

exclusive right to make all decisions concerning the lumber after off-loading. Once Delta Hardwood exercised dominion and control over the lumber in storing and processing on its dock, coverage under the policy expired. Moreover, the dock was used by Delta Hardwood as an "equivalent place of storage" for the lumber, and therefore the final warehouse had been reached upon off-loading from the vessel.

■ In *First American Artificial Flowers, Inc. v. AFIA Worldwide Ins.*, 1977 Am.Mar.Cas. 376 (N.Y.Sup.Ct.1976), the court was called upon to determine whether coverage existed, in a warehouse to warehouse clause, during the ordinary course of transit until "delivery to the Consignee's or other final warehouse or place of storage at the destination named in the policy." 1977 A.M.C. at 376. In *First American*, a shipment of plastic artificial flowers had been shipped from Hong Kong to New York. Upon arrival of the shipment in New York, the container loaded with the flowers was trucked from the vessel to the consignee's warehouse and activity to unload the trailer commenced. Before the container could be completely emptied, however, five o'clock p.m. arrived, the container was secured, and the consignee's employees went home for the day. When the workers arrived the next morning to complete unloading the container, they discovered that the remaining contents had been stolen. The shipper of the flowers sued its underwriters on the grounds that the "transit" policy of insurance required delivery into the warehouse of the consignee and that because that event had not occurred prior to the loss, there was insurance coverage. The court reasoned:

> [T]he Court is of the opinion that by opening the sealed container and removing some of the contents thereof, the insured accepted delivery outside of the warehouse and terminated the coverage. Once Plaintiff accepted the goods, it was free to commence unloading and continue with that work until the job was completed. It was also free to leave some of the

goods on the truck until it was more convenient to unload—but at its own risk. The plaintiff could not "extend indefinitely the duration of defendant's policy risk after the goods were at destination." 1977 A.M.C. at 379.

The court in *First American* relied upon, among other cases *Boonton Handbag Co. v. The Home Ins. Co.*, 125 N.J.Super. 287, 310 A.2d 510 (1973), a similar case which also held that the arrival of the truck at the consignee's warehouse was sufficient to terminate transit coverage under the policy. The guiding precept behind both of these cases is that a transit policy of insurance should not be stretched or tortured to provide coverage for losses which take place after delivery at the consignee's facility. In those instances where it is simply more convenient for the consignee to allow the cargo to be stored outside its warehouse, the shipper cannot indefinitely avail himself of coverage because the cargo is allegedly "in transit." Once the final destination has been reached, transit has ceased. Consequently, coverage must also cease.

■ Lumber & Wood argues that New Hampshire's policy of insurance covered this loss because an extraordinary delay was caused by circumstances beyond the control of the assured, and thus coverage was indefinitely extended. It is contended that Delta Hardwood's warehouse facility was already stocked with lumber to the point where no more lumber could be stored. There exists other testimony, however, that there was room to store additional lumber in the warehouse, but that Delta Hardwood chose to process the lumber on the dock prior to moving it ninety feet into the warehouse. Clearly, the delay, as prescribed in Clause 26, was not caused by circumstances beyond the control of the assured.

The case of *Fireman's Fund Ins. Co. v. Service Transportation Co.*, 466 F.Supp. 934 (D.Md.1979), involved a shipment of coffee which was destroyed by fire some three weeks after it had been off-loaded at the warehouse. The defendant's under-

writers were joined as a party defendant under the theory that the coffee, since it had not been delivered to its ultimate consignee, was still "in transit" when the loss occurred. The court relied on *Boonton Handbag* in holding that the insurance contract had to be construed in light of the reasonable needs and expectations of the insured.

Clause 25 of the policy, the Warehouse to Warehouse Clause, specifically states that coverage continues after the cargo is discharged from the vessel if the cargo continues to be "in transit" until either (1) the cargo is delivered into the final warehouse at the destination named in the policy, or (2) until fifteen days expire from the safe discharge of the cargo, whichever occurs first. On August 11, Delta Hardwood took complete dominion and control over the lumber. It moved some of the lumber off the dock, began an in-house process of inspecting the lumber, and ultimately would have sold the remainder of the lumber directly from the dock or would have placed it in its warehouse proper. Thirty-two days elapsed from the time of delivery of the lumber to Delta Hardwood and the loss caused by Hurricane Frederic.

One more point needs to be addressed and that centers on a theory of estoppel. The trial court made an additional Finding of Fact that "[a]gents for New Hampshire advised Lumber & Wood that its insurance was in full force and effect as long as the lumber in question was out of the insured's control. The insured was further advised that the lumber would remain insured while on the docks, without additional premium." Lumber & Wood argues on appeal that it relied on New Hampshire's representations as to coverage and, as such, New Hampshire is estopped from denying coverage. New Hampshire contends that Lumber & Wood never pled estoppel as a cause of action in its original or amended complaint, in the pretrial stipulation or in a motion to amend the pleadings. Thus, New Hampshire has filed a motion to strike from Lumber & Wood's brief all references to the estoppel theory.

Our review of the record indicates that Lumber & Wood's insurance by estoppel cause of action was never properly asserted during the course of proceedings at the trial level. A review of the trial transcript reveals that the telephone conversations of September 12 all revolve around the phrase "beyond the control of the assured" in Clauses 25 and 26 of the policy. Additionally, the district court's Findings of Fact and Conclusions of Law clearly establish that the ultimate conclusion that insurance coverage existed was based on the written policy of insurance, not an estoppel theory. Even if it had been properly pled, insurance coverage in a case like this cannot be created by estoppel. *See Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 487 (5th Cir.1960); *Six L's Packing Co. v. Florida Farm Bureau Mutual Ins. Co.*, 268 So.2d 560 (Fla.Dist.Ct.App.1972), *aff'd*, 276 So.2d 37, 38 (Fla.1973).

The lumber was "in transit" as it was shipped from South America to Chickasaw. The lumber was covered throughout that travel period, including temporary stops, incidental delays and deviations from the planned route of travel. When the lumber reached its destination at Delta Hardwood's dock, the lumber could no longer be considered "in transit." The lumber had arrived at its "final warehouse" and was merely being stored prior to being sold. Transit had ceased. It is well-recognized that insurance policies are to be construed so as to comport with the reasonable coverage expectations of the insured. Under the facts presented in this case, a reasonable insured would not look to an "in transit" policy for recompense for this loss, but rather would reasonably expect to be compensated under a policy insuring against loss of property by destruction.

Because we find in our review of the record that Lumber & Wood's claim lacks merit, the final judgment of the district court is

REVERSED and RENDERED. The court below shall enter judgment that Lumber & Wood Products, Incorporated, takes nothing from New Hampshire Insurance

Company, including any claim for attorney's fees.