**NORTHERN FEATHER INTERNATIONAL, INC., Plaintiff,**

v.

**THOSE CERTAIN LONDON UNDERWRITERS SUBSCRIBING TO POLICY NO. JWP108 THROUGH WIGHAM POLAND, LTD., Defendants.**

**Civ. A. No. 86–2424.**

United States District Court,
D. New Jersey.

Feb. 22, 1989.

Such & D'Alessandro, West Orange, N.J., and Weg & Meyers by Barbara A. Madarazzo, New York City, for plaintiff.

Tompkins McGuire & Wachenfeld by William J. Prout, Jr., Thomas W. Duffey, Newark, N.J., and Mendes & Mount by Louis M. Rohrberg, New York City, for defendants.

## OPINION

BISSELL, District Judge.

This civil action was filed on June 23, 1986 and alleges that the defendants, Those Certain London Underwriters, have failed to make payments under an "Open Cargo" insurance policy on two shipments of cotton cloth destroyed in a warehouse fire on February 21, 1985. Plaintiff, Northern Feather International, Inc. (Northern Feather) has attempted to invoke the diversity jurisdiction of this court pursuant to 28 U.S.C. § 1332. The Court is satisfied that complete diversity is lacking inasmuch as defendant, Sea Insurance

Company, Ltd., like the plaintiff, is a citizen of New Jersey. This Court does, however, have original jurisdiction over this action pursuant to the admiralty or maritime jurisdiction set forth in 28 U.S.C. § 1333.

Presently before the Court is defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment.

## STATEMENT OF FACTS

Northern Feather purchases cotton cloth from C & L Enterprises Limited, Hong Kong, which is imported by Northern Feather's Danish parent company Nordisk Fjer. (Pretrial Order at 2–3; Defendants' Br. in Support, Exh. A). Defendants issued Northern Feather an "Open Cargo" insurance policy effective October 1, 1984 which insured shipments of plaintiff's goods and merchandise "against all risks of physical loss or damage from any external cause" with certain exceptions to be discussed later in this opinion. (Pretrial Order at 8; Defendants' Br. in Support, Exh. F). Northern Feather had paid all premiums and had an insurable interest in the destroyed shipments of cloth. Defendants have made no payment for the loss. (Pretrial Order at 8).

The following are the relevant stipulated facts contained in the "Pretrial Order" dated May 6, 1988:[1]

Prior to the two shipments which are the subject of this claim, plaintiff had for some time been entering similar imports through United States Customs, under a tariff schedule category known as Visa Classification 320, covering dyed cloth. The tariff schedule sets forth the rate of duty for the described product and quota restrictions, if anu. (There are no quota restrictions for Visa Classification 320.)

On November 24, 1982, there were published in the Federal Register revisions to the textile category system in the tariffs which were effective January 1, 1983. A new visa category No. 315 covering printed cloth was established at

1. Although this is not the final pretrial order, the document in its present form has been signed by both parties and the stipulation of facts contained therein has essentialy been adopted in each parties' statement of undisputed facts.

such time, and this category was quota restricted. This visa category was cross-indexed with the same item number and description under the Tariff Schedules of the United States, Annotated (T.S.U.S. A.), containing the appropriate duty rates for various commodities including printed cloth.

Although most shipments of plaintiff were routinely released by Customs officials in New Jersey, and allegedly all such shipments were routinely released by Customs officials in New York, plaintiff began experiencing problems in entering these printed cloth shipments under category 320, at least as early as October, 1984.

On July 19, 1984, C & L ENTERPRISES, plaintiff's supplier, shipped 59 rolls of the comforter cloth from Hong Kong to plaintiff. The goods arrived in Newark, New Jersey on August 21, 1984, and Customs released the goods for delivery under a regular Consumption Entry prepared by plaintiff's agent which reflected that the goods were being entered under Visa Category 320.

However, on October 16, 1984, the United States Customs Office in Newark issued a Notice for Re-delivery of the 59 rolls because, upon review, it was alleged by Customs that the correct Visa Category had not been used. Customs noted that the correct visa number should have been 315, as the fabric was considered printed cloth. [See Defendants' Br. in Support, Exh. B]. Once the Notice for Re-delivery had been issued, the plaintiff was required to deliver the goods to Customs or risk a fine. The goods having been delivered and consumed by that time, plaintiff was unable to redeliver to Customs.

On August 10, 1984, another shipment of plaintiff, consisting of 185 rolls of fabric left Hong Kong aboard the S/S President Peirce. The goods arrived in Newark on September 27, 1984, were entered also under Category 320 and were routinely released by Customs under a regular Consumption Entry prepared by plaintiff's agent. Customs, however, issued a Notice for Re-delivery

of the 185 rolls on October 19, 1984, once again because of the use of an improper visa number. [See Defendants' Br. in Support, Exh. C]. This shipment was also unavailable for redelivery pursuant to the Notice for Redelivery because the goods had been delivered and consumed.

On November 2, 1984, plaintiff requested from Customs an extension to reply to the October 16th and October 19th Notices for Redelivery on the ground they needed additional time to research the problem.

Plaintiff had attempted to get the Hong Kong authorities through C & L ENTERPRISES LIMITED to change the category number to comply with Customs' requirements to [sic] regards the goods in question, but to no avail.

On January 8, 1985, plaintiff requested the Customs Classification and Value Department, Washington, D.C., to make a formal ruling on the use of visa category Nos. 315 and 320. The matter was referred to the New York Office of Customs, which maintained that Category 315 was the proper visa.

Customs issued a Notice of Penalty in the amount of $20,991.00 on January 15, 1985, due to plaintiff's failure to comply with the October 16th Notice for Re-Delivery of the July 19th shipment. A similar Notice imposing a penalty of $186,-560.00 was issued by Customs on January 16, 1985, for plaintiff's inability to comply with the October 19, 1984 Notice for Re-delivery of the August 10, 1984 shipment. The two Notices of Penalty were eventually cancelled.

The first shipment for which the plaintiff is claiming under the Cargo Policy consisted of 125 rolls of dyed cotton ticking, valued at $151,386.59. These cotton piecegoods were manufactured in Taiwan and subsequently dyed in Hong Kong for use as comforter cloth. C & L ENTERPRISES, LTD., Hong Kong, sold the goods to plaintiff C & F New York.

The goods were shipped aboard the S/S President Eisenhower, from Hong Kong on October 9, 1984. After discharge from the overseas vessel in San

Pedro, California on November 6, 1984, the cotton cloth was issued an entry number by United States Customs, and carried by rail to its final destination at the port of New York. On November 14, 1984, the goods arrived at American Terminals in South Kearny, New Jersey, and on November 27, 1984 plaintiff's agent prepared a Custom's consumption entry for the goods under category 320. United States Customs refused to allow a consumption entry under that number, maintaining that the correct visa number was 315. Customs directed plaintiff's agent to enter the goods in bond under a warehouse entry, and this was done. The goods were put into the Van Brunt Warehouse in Elizabeth, New Jersey, a bonded warehouse selected by plaintiff's agent, and they remained stored in bond there, until the casualty, pending resolution of the category dispute with Customs.

The second shipment destroyed in the warehouse fire consisted of 63 rolls of dyed cotton ticking, and was valued at $72,968.06. These goods were also sold by C & F New York to the plaintiff by C & L ENTERPRISES. On December 16, 1984, the goods were shipped aboard the S/S President Madison to San Pedro where an entry number was issued by Customs on December 30, 1984. Subsequently, the rolls of cloth were transshipped by rail to their final destination at the port of New York.

In early January, 1985, the goods arrived at American Terminals where they remained for at least three weeks until picked up by plaintiff's truckers, Gross Transportation Corp., on February 7, 1985. Plaintiff's agent, aware of the ongoing dispute, did not attempt a consumption entry on this shipment but rather prepared a warehouse entry for the goods, dated January 31, 1985. The agent issued delivery instructions to Gross Transportation Corp. on February 1st to pick up the goods directly from the pier at South Kearny and deliver them to Van Brunt's bonded warehouse. On the preceding day, plaintiff's agent requested the Customs' Import Specialist to conduct a textile review of the goods due to the prior visa entry problems. During this textile review period, Gross Transportation delivered the bonded goods to the Van Brunt Warehouse on February 11, 1985, where they remained until the fire. On February 14, 1985, Customs issued a correction slip notification for the goods to plaintiff stating that Visa Category 315 should have been used rather than No. 320, which had been designated by plaintiff for both shipments then in storage at Van Brunt.

A fire totally destroyed the Van Brunt Warehouse and plaintiff's goods therein on February 21, 1985.

(Pretrial Order at 3–8; Defendants' Br. in Support, Exh. A).

Defendants contend that plaintiff's losses are not covered by its insurance policy for three reasons: (1) the insurance coverage provided by the "Warehouse to Warehouse" clause had ceased prior to the fire on February 21, 1985; (2) the interruptions of transit of shipments were not due to circumstances beyond plaintiff's control so that plaintiff is not covered under the policy's Marine Extension Clause; (3) even assuming the extension of the period of coverage by either of the two foregoing clauses the losses which occurred during the "detainment" of the shipments are excluded from coverage by the policy's "Free of Capture & Seizure Clause." Plaintiff opposes each of these contentions and seeks summary judgment in its favor.

Summary judgment may be granted only when it has been established that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of establishing that there exists no genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposing party must set forth specific facts showing a genuine issue exists. *Id.* Such facts shall be made on personal knowledge in the form of an affidavit. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the facts must be viewed in the light most favorable

to the non-moving party and any reasonable doubt as to the existence of a genuine issue of fact must be resolved against the moving party. *Continental Ins. Co. v. Bodie,* 682 F.2d 436 (3d Cir.1982).

## I. "Warehouse to Warehouse Clause"

The policy's "Warehouse to Warehouse Clause" provides as follows:

> This insurance attaches from the time the goods leave the warehouse and/or store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transshipments, if any, until the goods are discharged overside from the overseas vessel at the final port. *Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur.* The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. *Held covered at a premium to be arranged in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the Assured.*
>
> NOTE: It is necessary for the *Assured to give prompt notice to these Assurers when the Assured becomes aware of an event for which they are "held covered" under this policy and the right to such cover is dependent upon compliance with this obligation.*

(Defendants' Br. in Support, Exh. F at 2–3) (emphasis added).

The "Warehouse to Warehouse" clause specifically extends coverage beyond the period of transit to the time of delivery to the "final warehouse at the destination named in the policy." Plaintiff concedes that because the goods in question were discharged overside from the overseas vessels, in San Pedro, California, more than 30 days before their destruction by fire, that 30–day clause applies, has run, and thus has rendered any "final warehouse" issue itself irrelevant. However, case law interpreting "final warehouse" provisions is instructive on the "held covered" provision of the warehouse to warehouse clause, on which the parties in this action are in disagreement.

In *Ocean Marine Ins. Co. v. Lindo,* 30 F.2d 782 (9th Cir.1929), shipments of cotton were temporarily placed in a Customs warehouse until Customs regulations were complied with and were destroyed in a warehouse fire prior to the consignee's removal for reshipment. The court was called upon to decide whether the period of coverage was extended by a similar "warehouse to warehouse" clause similar to that which is presently at issue. The court stated in relevant part:

> ... the evidence shows that all goods going to Guatemala, whether dutiable or not, must pass through the custom house at San Jose, comply with the customs regulations, and pay certain fees. Until these requirements are complied with, the consignee is not entitled to the possession of the goods. There was no unreasonable delay on the part of the consignee in the instant case. As a consequence it cannot be said, we think, that the goods were safely deposited in the consignee's or other warehouse within the meaning of the policy, while in the custom house, regardless of the nature or character of the building or structure used by the government for the storage of goods while passing customs. The warehouse to warehouse clause was evidently intended to cover the goods after being discharged at port of destination while in the ordinary course of transit to the consignee's warehouse, or *some other equivalent place of storage where the goods were held for the consignee.* The risk continued after the goods were landed and during the period reasonably required for this purpose,....

We are unable therefore to agree that taking the goods to the custom house for

the purpose of clearance accomplished the safe deposit thereof in consignee's or other warehouse referred to in the policy, in the absence of some voluntary act of neglect of the consignees indicating an intention to adopt the custom house as a place of storage of their goods.

*Id.* at 784 (emphasis added).

Defendants contend that the Van Brunt warehouse was equivalent to Northern Feather's own warehouse inasmuch as the "delivery to and release of the goods from [Van Brunt] was solely dependent upon Northern Feather's compliance with U.S. Customs' requirements." (Defendants' Br. in Support at 12; Hardy Dep., App. to Plaintiff's Br., Exh. D at 4–5). Defendants further contend that inasmuch as plaintiff selected the Van Brunt Warehouse as the depository for the shipments at issue, the Van Brunt is the "final warehouse" as contemplated by the policy. (Defendants' Br. at 11).

Defendants rely in part on *Marten v. The Nippon Sea and Lane Insurance Company, Limited,* 3 Commercial Cases 164 (1898), where the court held that delivery of a shipment to a Customs warehouse was the equivalent of delivery to a consignor's own warehouse and accordingly, that the insurer was free from liability under the policy's "warehouse to warehouse" clause.

Northern Feather relies in part on the decision in *Ocean Marine* contending that its non-compliance with Customs regulations was not based on its own negligence and that it had no choice but to temporarily place the goods in the Van Brunt warehouse. Northern also argues that this lack of choice distinguishes its situation from that of the plaintiffs in *Marten* who had the option of securing the release of its shipment simply by paying the necessary import duties. (Plaintiff's Br. in Opp. at 16).

Northern's contentions that it lacked control over Customs' retention of the shipment is supported by affidavit and deposition testimony. The relevant testimony of John Walker Hardy, defendants' adjustor of claims, states as follows:

Q. Are you aware of the fact that it was Customs's understanding with regard to these particular goods that they were not free to enter the United States, that at the time of the fire the goods were in the custody of Customs?

A. Yes, they had been placed under the direction of Customs. The assured had to do what the Customs told them to do about those goods. And other goods too.

Q. You were aware of the fact that it was not the choice of the assured to place these goods in the Van Brunt warehouse? ...

A. I understand from the information which I have on this case that the assured elected to put those goods into that warehouse because he was not free to dispose of them elsewhere, and so he made a choice, at least on those shipments, to put them into the Van Brunt warehouse pending any release by Customs.

Q. That statement seems inconsistent to me, so let me ask you another question. Is it your understanding that at the time of the loss these goods were in the custody of Customs?

A. I think they were in the custody of the assured, but he was restricted with what he could do with the goods. He had to keep them in bond.

Q. Who placed that restriction?

A. The Customs.

Q. So it is your understanding that at the time of the loss the assured had been instructed by Customs to place these goods where they were?

    .     .     .     .     .

A. My understanding was that the assured was not free to dispose of those goods as he wished.

(Plaintiff's Br., App.Exh. B).

Edward Wulff, Vice–President of Northern Feather, testified as follows:

A. To my knowledge, the first shipment of goods was placed in the Van Brunt warehouse because there was a ... visa category dispute with the US customs.

Q. Do you know whether Northern Feather voluntarily placed these goods at the Van Brunt warehouse?

A. The arrangements were made by Import Export Service of New Jersey.

Q. Were those arrangements consented to by Northern Feather.

A. *We were told the goods had to be removed from the dock and Import Export Service said the only available space was at Van Brunt warehouse, so we consented to having the goods sent to Van Brunt warehouse because we could not get the goods.*

Q. And Import Export is an agent that is employed by Northern Feather; isn't that correct?

A. That is correct.

Q. Now, with regard to the second shipment do you know why it was that Northern Feather or any agent of Northern Feather placed the goods at the Van Brunt warehouse?

A. The second shipment also ran into a visa dispute with US customs whereas we could not get release of our goods.

Q. To your knowledge, was there any difference in the circumstances surrounding Import Export's decision to warehouse the goods and when I say difference I mean between the decision between the first shipment vis-a-vis the second shipment?

A. To my knowledge, there was no difference in the situations.

●  ●  ●  ●  ●

■ The Court is satisfied, based on the foregoing testimony, that the U.S. Customs Service prevented plaintiff from assuming control over the two shipments and that plaintiff's agent made the decision to send the goods to the Van Brunt warehouse

pending Customs' release because there was no room elsewhere.[2] The important question, however, regarding Northern Feather's responsibility for the retention by Customs is whether Northern Feather was responsible for initially marking the shipments with visa category 320 instead of category 315 and, if so, was this classification justified.

The circumstances surrounding the labeling of the shipments are set forth in the certification of Edward Wulff as follows:

A crucial element of the importation process is the visa category number which, for the purposes of NORTHERN FEATHER INTERNATIONAL, INC.'s needs has always been 320 for this specific comforter cloth.

In October of 1984, a dispute arose between NORTHERN FEATHER INTERNATIONAL, INC and United States Customs in regard to imports of plaintiff which arrived in Newark, New Jersey on August 21, 1984 and September 27, 1984, respectively.

The dispute centered on the correctness of the visa category number used with customs, whereby customs claimed that the correct number was 315 and plantiff maintained that it was 320 as always for this specific comforter.

Subsequent to this dispute with customs, NORTHERN FEATHER INTERNATIONAL, INC. has had other items imported from Hong Kong under visa category number 320 that have been accepted at ports other than Newark.

The net result of this dispute was that customs would not allow entry of the goods into the country.

●  ●  ●  ●  ●

2. With regard to the second shipment defendants argue,

[S]ince Customs did not issue a notification to plaintiff regarding the VISA classification problem until February 14, 1985, plaintiff cannot reasonably argue that the interruption in transit which is claimed to have arisen from circumstances beyond their control (*i.e.,* Customs' intervention) occurred while the goods were still covered under the Warehouse to Warehouse Clause.

(Defendants' Reply Letter–Memo at 2–3). While it is true that Customs did not issue a correction slip concerning the categorization of the second shipment until February 14, 1985 (*see* Stip. of Facts above at 5), the Wulff certification which states that Customs directed plaintiff to put the second shipment in a bonded warehouse (¶ 12) presents at least a genuine issue of material fact concerning plaintiff's control over this latter shipment.

NORTHERN FEATHER INTERNATIONAL, INC. made all possible efforts through various governmental agencies to settle this visa dispute with customs and obtain the release of the goods.

The efforts to release the goods to the Northern Feather's Warehouse were to no avail as customs would not permit the visa number to be changed and the Hong Kong importers informed Northern Feather that they were unwilling to use the 315 category number, as their opinion has always been that the 320 number was proper.

> .  .  .  .  .

NORTHERN FEATHER INTERNATIONAL, INC. did not at any time have the ability to control what visa category number was placed on the goods, that being the province of the exporters in Hong Kong.

(Wolff Cert., ¶¶ 6–10, 13, 18).[3] It is not disputed that Northern Feather had notice as early as 1982 of the change in Customs' textile categories. (*See* Stip. Facts above at 3). Defendants point to Northern Feather's letters to the U.S. Customs Service dated November 19 and November 20, 1984 regarding two earlier shipments which stated in part:

> Please be advised, with reference to your notice of redelivery, that indeed the goods were improperly classified. The material is, in fact, printcloth and should not have been entered under the "other" category.
>
> The error was made in good faith with no deliberate intent to mislead. We are willing to cooperate in the most expeditious fashion in order to resolve this matter.

(Defendants' Br. in Support, Exhs. D and E).

Inasmuch as the two shipments in question were sent after plaintiff's November 1984 acknowledgments of misclassification of earlier shipments, the Court finds that there is a genuine issue of material fact concerning whether Northern Feather was powerless to assure that the Hong Kong exporters properly classified the later shipments. Furthermore, the Court has no information concerning whether there was an agency relationship between Northern Feathern and the foreign exporters which could impute to Northern Feather the responsibility for any mislabeling.

Additionally, Northern Feather states that there "remains a question of whether the visa category number 320 was proper or not." (Plaintiff's Br. at 21). This position is supported by the following sections of the survey report concerning the February 21, 1985 fire:

> Correspondence between consignee and principals indicates that the visa number used in this shipment 320, was in fact the same as had been used satisfactorily in earlier shipments without any problems or contest by the Customs and on January 8, 1985, *consignee wrote to the U.S. Customs service in Washington giving their reasons why the revised or new Customs determination appeared to be unreasonable and requesting revision of the order.* It was pointed out that it is very difficult to have the exportation documents from Hong Kong reissued.
>
> *The Customs response was apparently verbal whereby consignee was asked to contact other people at the U.S. Customs and this matter had not been resolved on February 21, 1985, when the fire occurred consuming the shipments stored at the warehouse.*
>
> *Whilst the reclassification order is being contested naturally the goods were not free to enter the United States* and had to be stored in a bonded warehouse while the matter was being resolved, and the goods were taken to Van Brunt Warehouse for the duration.

(Plaintiff's Br., App.Exh. E at 3) (emphasis added).

Without having any background information with regard to the classification contest or the result thereof, and without knowing whether plaintiff had control over

---

**3.** The deposition testimony of Ilene Shope, a representative of the Import–Export Service of New Jersey, states that the determination to classify the goods under the category 320 was made by the "foreign country." (Plaintiff's Br., App.Exh. F).

the categorization of its shipments, this Court cannot determine as a matter of law whether the delay in the transporation of the two shipments "was beyond the control" of Northern Feather. A genuine issue exists regarding that provision.

■ However, coverage under the "hold covered" clause "is dependent upon" the insured's giving "prompt notice" to the insurer "of an event for which they are 'held covered' under this policy." (Defendants' Br., Exh. F). Defendants contend that "it is undisputed that plaintiff neglected to notify Underwriters that the shipment had been delayed for an interruption in transit until after the loss," which was not the "prompt notice" required. (Defendants' Br., at 10–11; Defendants' Reply Letter—Memo at 2). Plaintiff does not adequately refute or excuse the absence of such "prompt notice" in this case. Accordingly, defendant is entitled to partial summary judgment that the warehouse to warehouse clause does not provide coverage for plaintiff's loss in this case.

## II. "Marine Extension Clauses"

■ The "Marine Extension Clauses" provide in relevant part:

Notwithstanding anything to the contrary contained in or endorsed on this policy, it is understood and agreed that in consideration of premium as agreed the following terms and conditions shall apply to all shipments which become at risk under policy.

(1) This insurance attaches from the time the goods leave the warehouse at the place named in the policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the final warehouse at the destination named in the policy, certificate or declaration, or a substituted destination as provided in Clause C. hereunder.

(2) This insurance specially covers the goods during

(i) deviation, delay, forced discharge, reshipment and transshipment.

(ii) any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment.

. . . . .

(7) *It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond control of the Assured.*

. . . . .

(Defendants' Br., Exh. F at 3–4) (emphasis added).

The parties agree that coverage pursuant to the foregoing section depends on whether the delay in transit of the shipments is found to be "beyond control" of the plaintiff. As discussed in the foregoing section concerning the "Warehouse to Warehouse Clause," the Court has found a genuine issue of material fact in this regard. Accordingly, the Court cannot find as a matter of law that the condition precedent to coverage to the "Marine Extension Clause" has or has not been met.

## III. "Free of Capture and Seizure Clause"

■ Defendants argue that even if the period of coverage was extended by the "Warehouse to Warehouse Clause" or by the "Marine Extension Clause," coverage would still be excluded by the policy's "Free of Capture and Seizure Clause" which provides in pertinent part:

The following warranties shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers specifically to the risks excluded by these Warranties and expressly assumes said risks:

*F.C. & S. (FREE OF CAPTURE & SEIZURE): (April 3, 1980)*

A. *Notwithstanding anything herein contained to the contrary, this insurance is warranted free from:*

(a) capture, seizure, arrest, restraining, *detainment,* confiscation, preemption, requisition or nationalization *and the consequences thereof or* any attempt thereafter, *whether in time of*

*peace or war, and whether lawful or otherwise; ...*

(Defendants' Br., Exh. H at 13) (emphasis added).

Defendants point to the following paragraph of the "Marine Extension Clause" to demonstrate that the Warehouse to Warehouse and Marine Extention Clauses are superseded by the warranties contained in the FC & S Clause:

> All other terms and conditions of the policy not in conflict with the foregoing remain unchanged, it being particularly understood and agreed that the F.C. & S. Clause remains in full force and effect and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities.

(Defendants' Br., Exh. F at 4).

Defendants contend that Northern Feather's losses which occurred during the period of the Customs' detention occurred during "breach" of these warranties and thus are excluded from coverage. (Defendants' Br. at 26). Defendants are correct in their assertion that courts have recognized the expansion of the FC & S Clause's exclusion for "detainment" to include lawful detention by civil authorities in time of peace.[4] *See Blaine Richards & Company v. Marine Indemnity Insurance Company of America*, 635 F.2d 1051, 1053 (2d Cir.1980); *Resin Coatings Corp. v. Fidelity and Casualty Company of New York*, 489 F.Supp. 73, 74 (S.D.Fla.1980); *Pantcho Nakasheff v. Continental Insurance Company*, 1954 A.M.C. 986, 988 (S.D.N.Y. 1953).[5]

In *Resin Coatings*, the court excluded coverage for loss of shipment based on its findings that "the actions of Arabian Customs constituted a seizure within the meaning of the FC & S clause, and that the seizure was proximately caused by the fail-

ure of plaintiff to forward the proper documents to Saudi Arabia." 489 F.Supp. at 74. In *Pantcho Nakasheff v. Continental Insurance Company*, 1954 A.M.C. 986 (S.D.N.Y.1953), the court held that heat damage sustained by plaintiff's shipment which occurred during a lawful Customs' detention was excluded from coverage under the policy's FC & S Clause. In the present action, there is no question that the loss to Northern Feather's shipment occurred during the Customs' detention.

The language of the FC & S clause is clear that a loss occurring during detainment will be excluded from coverage. Accordingly, defendant's motion for summary judgment on the FC & S clause exclusion is granted.

## ORDER

For the reasons set forth in the Court's opinion filed herewith,

It is on this 22nd day of February, 1989,

ORDERED that defendants' motion for summary judgment be and it hereby is granted; and it is further

ORDERED that plaintiff's cross-motion for summary judgment be and it hereby is denied and its complaint is dismissed in its entirety.

---

**4.** The Court rejects Northern Feather's argument that clause 7 of the Marine Extension Clause which states that "... the F.C. & S. Clause remains in full force and effect and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities," limits the FC & S Clause to incidents of war or hostilities.

Such interpretation would make the express language of the FC & S Clause (*i.e.,* "whether in times of peace or war") mere surplusage.

**5.** In *Blaine Richards* and *Resin Coatings,* the FC & S Clauses were identical to the clause in the present case.