[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

----------------------------------------

No. 07-14446
Non-Argument Calendar

----------------------------------------

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 22, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 06-00708-CV-C-1

GREAT SOUTHERN WOOD PRESERVING, INC.,

Plaintiff-Appellant,

versus

AMERICAN HOME ASSURANCE COMPANY,
AIG,
AMERICAN INTERNATIONAL UNDERWRITERS
CORPORATION,
AMERICAN INTERNATIONAL MARINE AGENCY,

Defendants-Appellees.

----------------------------------------------------------------
Appeal from the United States District Court
for the Middle District of Alabama
----------------------------------------------------------------

**(August 22, 2008)**

Before EDMONDSON, Chief Judge, TJOFLAT and BLACK, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Great Southern Wood Preserving, Inc. ("Great Southern") appeals the grant of summary judgment in favor of Defendant-Appellee American Home Assurance Company ("American Home") on Great Southern's insurance claims. No reversible error has been shown; we affirm.

Great Southern imports raw lumber which it chemically treats at one of its domestic treatment facilities and then resells to retail and independent business customers. The imported lumber is delivered by ship and discharged at ports in the United States. American Home issued Great Southern a Marine Open Cargo Insurance Policy effective 2 June 2005 (the "Policy"). Two shipments of raw lumber received by Great Southern at the Port of Gulfport in August 2005 are at issue in this case.

Because trucking lanes are limited at the Port of Gulfport, the logistics of picking up a large load of cargo is difficult. Great Southern entered into a warehouse lease with the Mississippi State Port Authority to allow the short-term storage by Great Southern of lumber discharged at the Port of Gulfport. On 3 August 2005, the Kestral Arrow arrived at Gulfport bearing 4,056 packs of lumber for Great Southern. On 8 August 2005, Great Southern began transporting these packs to its treatment facilities. On 25 August 2005, the Sanko Stream arrived at

Gulfport bearing approximately 100 tractor-trailer loads of raw lumber for Great Southern. On 29 August 2005, Hurricane Katrina hit the Port of Gulfport. The warehouse in which Great Southern stored its shipments was destroyed. Great Southern suffered the loss of the entire Sanko Stream shipment; also lost was that portion of the Kestral Arrow shipment – 28 per cent – that had not yet been transported from the warehouse.

Great Southern filed a claim under the Policy for the lost lumber. American Home denied the claim contending that coverage under the Policy had ceased before the time of loss. In the light of that denial, Great Southern brought suit asserting claims of breach of contract and bad faith.

The Policy contained a "warehouse-to-warehouse" provision that is oftentimes included in marine cargo insurance:

> This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration and/or Certificate for the commencement of transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur.

3

According to Great Southern, the lumber it imported into Gulfport had as its final destination one of Great Southern's treatment facilities;[1] so, under the warehouse-to-warehouse clause, the Policy insured the cargo until the cargo was delivered to a Great Southern treatment facility (assuming – as is the case here – the 30-day period had not yet expired).[2] Great Southern maintained that the whole phrase in the Policy "in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy" was ambiguous; and "Alabama law instructs that ambiguities in insurance contracts are to be interpreted in favor of the insured." Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc., 480 F.3d 1254, 1264 (11th Cir. 2007).

But the district court recognized no ambiguity: warehouse-to-warehouse clauses are standard throughout the marine insurance industry;[3] the contract language had a settled meaning in the industry. And under that settled meaning,

---

[1] Great Southern concedes that it sometimes sells raw lumber to other manufacturers directly from the Gulfport warehouse.

[2] Although the Policy references the final warehouse at the destination named in the policy, the Policy named no such destination.

[3] As the district court explained, although diversity jurisdiction applied, the suit also was cognizable under admiralty jurisdiction by virtue of the maritime contract at issue. "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." Norfolk Southern Railway Co. v. Kirby, 125 S.Ct. 385, 392 (2004).

4

once the insured exercised dominion and control over the cargo it no longer was in transit and coverage ceased. We agree.

Lumber & Wood Products, Inc. v. New Hampshire Ins. Co., 807 F.2d 916 (11th Cir. 1987), involved similar facts. A shipment of lumber of the insured reached the private dock of a third-party consignee in good order. The lumber was off-loaded and had to be moved about ninety feet to be placed in the consignee's warehouse. The consignee had responsibility for and control over the lumber once it was off-loaded from the vessel; and it had a practice of sometimes selling some of the off-loaded lumber directly from its dock. Because an earlier shipment occupied the warehouse space at the dock, the lumber remained on the dock outside the warehouse; a hurricane came through and damaged the exposed lumber. At issue was whether the lumber was "in transit" within the meaning of the warehouse-to-warehouse clause.

We determined that, once the consignee "exercised dominion and control over the lumber in storing and processing on its dock, coverage under the policy expired;" "a transit policy of insurance should not be stretched or tortured to provide coverage for losses which take place after delivery at the consignee's facility." Id. at 920.

As was the case with the consignee in <u>Lumber & Wood Products</u>, Great Southern exercised dominion and control over the lumber once it was off-loaded from the vessel and placed in the warehouse space leased at the Port of Gulfport. According to the deposition testimony of Great Southern's import manager, he and other Great Southern employees made all decisions on the future destination for the temporarily-stored lumber. The warehouse operated as a staging area. Inventory levels and other supply and demand considerations were weighed by Great Southern's inventory management team to determine the Great Southern facility to which the lumber would be transported. And, again as was the case with the consignee in <u>Lumber & Wood Products</u>, from time to time Great Southern sold lumber directly from the Gulfport warehouse to other manufacturers. The district court concluded correctly that – as a matter of law – Great Southern exercised dominion and control over the lumber once it was off-loaded at the Port of Gulfport; at that point, for purposes of the warehouse-to-warehouse clause, the lumber had reached it "final warehouse" and "transit" had ceased.

Great Southern argues that the lumber off-loaded from the Sanko Stream could not be under Great Southern's dominion and control because the United States Department of Agriculture ("USDA") had not as yet cleared and released that lumber when the hurricane hit. Federal regulations restrict imported lumber

6

to the port of entry until a USDA inspector affirms that the regulated article is in compliance with applicable regulations. See 7 C.F.R. § 319.40-9. According to Great Southern, the USDA hold on the Sanko Stream lumber prevented Great Southern from exercising custody and control; the lumber consequently, was still "in transit" for insurance purposes.

The district court concluded – and we agree – that the restrictions imposed by the USDA regulations did not annul the dominion and control exercised by Great Southern over the goods held exclusively in its possession. A government hold on goods in the possession, custody and control of an insured does not render the goods "in transit" for purposes of insurance coverage. See Fireman's Fund Ins. Co. v. Service Trans. Co., 466 F.Supp. 934 (D.C. Md. 1979) (rejecting claim that coffee shipment that was subject to a Federal Drug Administration hold was "in the ordinary course of transit" when it was destroyed by fire at trucking company's terminal).

For the reasons stated by the district court, Great Southern's bad faith claim is without merit.

AFFIRMED.